# EXHIBIT "A"

# ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement") is entered into this ___ day of February, 2010, by and between HEIDTMAN MINING, LLC, an Ohio limited liability company ("Heidtman" or "Debtor") of 405 Madison Ave., Suite 1900, Toledo, Ohio, 43604, U.S.A., and __ _____and/or its Assigns ("PURCHASER"), of: _____ _____:

Heidtman owns a coal mine known as the Sebastian County Coal Mine ("Mine"), located in Sebastian County, Arkansas. Heidtman has agreed to sell and PURCHASER has agreed to purchase, certain assets associated with the Mine, subject to the conditions set forth below.

**Heidtman has filed for bankruptcy protection under Chapter 11 in the United States Bankruptcy Court and is currently operating as a debtor-in-possession. The bankruptcy case is pending as Case Number 09-72912 (the "Chapter 11 Case") in the United States Bankruptcy Court for the Western District of Arkansas, Fort Smith Division ("Bankruptcy Court"). This Agreement and all of the transactions provided for herein are subject to Bankruptcy Court approval. The date of such approval is referred to herein as the "Effective Date" of the Agreement.**

Now therefore, the parties agree as follows:

1. **Sale and Purchase .** Heidtman agrees to sell to PURCHASER, and PURCHASER agrees to purchase from Heidtman, on the terms and conditions hereinafter set forth, the following ("Property"):

(a)  The coal leaseholds, surface leaseholds, easements, fee coal interests and other rights described in Exhibit A, including all fixtures thereon, hereinafter referred to as "Coal Estate";

(b)  Equipment, facilities, materials, vehicles, fixtures, supplies, part inventories, other items of personal property, contracts, mine records, reports, data, maps, and other documents relating to the Mine, computer software, insurance policies and other tangible and intangible  rights described in Exhibit B;

(c)  All other assets, rights, or interests of Heidtman owned or used in connection with the Mine or the assets listed above in subparagraphs (a) and (b);

(d)  To the extent that any of the assets listed above are the subject of unexpired leases or executory contracts, Heidtman shall, at closing and after obtaining Bankruptcy Court approval, assume and assign its rights under such leases and contracts to the PURCHASER; and

(e)  Excluded Assets: Notwithstanding the foregoing provisions (a) – (d), the Property sold pursuant to this Agreement shall not include Heidtman's cash on hand, accounts receivable, accounts and financial instruments (including without limitation deposits or other securities for reclamation bonds), causes of action, claims (including without limitation claims for tax refunds); methane royalty for methane produced prior to the date of this Agreement but not yet paid (including without limitation all disputed royalty held in suspense or by a stakeholder); trade names and other intellectual property and all other assets shown on Exhibit C, the Excluded Asset Schedule.

2.  **Private Sale Of Property.**   (a) Following the execution of this Agreement and if the Debtor determines that the proposal contained herein is the highest and best bid for the property, the Debtor shall submit motions to the United States Bankruptcy Court for the Western District of Arkansas, Fort Smith Division, to sell the Property at a private and exclusive sale to Purchaser pursuant to 11 U.S.C. § 363, and to assume and assign executory contracts and unexpired leases pursuant to 11 U.S.C. §365(a).  Such motions shall seek a waiver of any applicable time period for notice pursuant to Fed. R. Bankr. P. 6004, or other applicable rules, so as to allow closing of this transaction as contemplated herein. The Debtor shall request that the Bankruptcy Court make a finding at the hearing on the proposed sale that the Property was sold in good faith within the meaning of Bankruptcy Code Section 363(m) and that the Purchaser is entitled to the protections thereunder.

(b)  Upon execution of this Agreement, Purchaser has deposited with the Debtor the amount of _____Dollars ($_____) (the "Deposit").  The Debtor shall hold the Deposit in escrow pending completion of the Conditions to Closing as set forth in Section 12 of this Agreement and satisfaction of any conditions as may be required by the Bankruptcy Court. Heidtman shall be entitled to retain the escrow amounts as a general asset of the bankruptcy estate if Purchaser defaults on its obligations in this Agreement, and fails to cure such default within five (5) business days after notice, or otherwise fails to close and fund the purchase of assets on the timetable set forth herein unless this Agreement expressly excuses such failure.

(c)  Nothing in this Agreement shall be construed to prevent or limit in any way, or at any time prior to Closing,  Heidtman's right to negotiate a sale of all or part of the Property to a third party at a higher and better price, or to conduct an auction of the Property.

3. **Purchase Price.**  The full purchase price of the Property is _____U.S.   Dollars ($_____) payable at closing in immediately available funds by wire transfer to Heidtman or as the Bankruptcy Court directs.  The purchase price shall be adjusted by applying the amount of the deposit set forth in Section 2 (b) of this Agreement.

4.  **Inventory; Information.**   (a)  The inventories (parts, supplies, fuel, consumables, etc.) are in the quantities shown on Exhibit B upon the date indicated in that Exhibit and no reduction in inventories shall occur other than in the normal course of business.

(b) At all times after execution of this Agreement, Heidtman shall make available to Purchaser all records necessary to confirm the inventory and all other records related to the Property,

including without limitation, all records relating to real property (including land files, leases, deeds, title insurance policies, title opinions and tax records), litigation files, historical inventories, purchaser orders, purchase contracts, and bills of lading.

5. **Continuation of Mine Operations; Costs.**  Prior to Closing, Heidtman shall:

(a)   continue the maintenance of the Mine in the ordinary course of business; equipment, facilities, vehicles, fixtures and other items of personal property described in Exhibit B may continue to be used and shall be maintained in current condition and so delivered at Closing subject to ordinary wear and tear which may occur subsequent to the date of this Agreement;

(b)   not sell, lease, place liens upon, suffer liens upon or otherwise encumber the Property without prior written consent of PURCHASER;

(c) comply in all material respects with all federal, state or local laws, ordinances and regulations applicable to the use or ownership of the Property and to pay all taxes when due from this date until the expiration of the Agreement term or closing;

(d)   maintain casualty insurance on all personal property in at least the current amounts of coverage and insure all newly acquired property at an amount sufficient to repair or replace it if there is loss;

(e) timely make (or accrue, for payment at Closing) all payments and perform all obligations required by leases, Agreements, Coal Estate agreements and other agreements which pertain to the Property or the Mine and otherwise perform as may be required under all such agreements;

(f)  not enter into any contract to sell coal from the Mine for delivery after Closing without the consent of PURCHASER; and

(g) not acquire or dispose of, or contract to acquire or dispose of, any equipment, supplies or services for the Mine other than in the normal course of operations.

(h) Debtor recognizes the importance to Purchaser for approval of a blowing ventilation plan/system, and Debtor will use its best efforts, in cooperation with Purchaser, to enter into an agreement with the Mine Safety and Health Administration (MSHA) regarding the blowing ventilation plan/system proposed to be used by Purchaser.

(i) use its best efforts, in cooperation with the Purchaser, to transfer to Purchaser Travelers Indemnity policy number 9948L166 UB, effective at closing.

PROVIDED, that nothing herein shall prevent Heidtman from deferring any payment so long as such deferral, by reason of agreement or protection of the bankruptcy laws, does not preclude cure by later payment at or after Closing by Purchaser.

**6.   Assumption of Liabilities.**   At Closing PURCHASER shall assume, and Heidtman shall assign and transfer to PURCHASER (and Heidtman shall be released from), subject to exceptions set forth in Section 7 of this Agreement, the following liabilities and obligations (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due), which collectively are hereafter referred to as the "Assumed Liabilities";

(a)   all existing and future reclamation, restoration, revegetation and other similar liabilities and obligations of Heidtman (or its affiliates or predecessors) under the Federal Surface Mining Control Act of 1977, as amended and the Arkansas Surface Coal Mining and Reclamation Act of 1979, as amended, including without limitation grading, soil replacement and other measures necessary or required to restore affected land, buildings, facilities, structures, roads, highways and appurtenances, and to prevent or mitigate adverse environmental impacts (collectively, the "Reclamation Obligations"),

(i) with respect to any geographic areas which are part of or which relate to the Mine and any geographic areas which are covered by any of the permits currently held by Heidtman and listed in the Permits Schedule (the "Existing Permits") attached hereto and Reclamation Bonds pertaining thereto ("Existing Reclamation Bonds");

(ii) with respect to the Coal Estate;  and

(iii) with respect to any buildings, facilities, structures, roads and highways located on the properties referred to in clauses (i) and (ii) above and any appurtenances attached thereto;

(c) all existing and future liabilities and obligations arising out of, relating to or in connection with any violation of, or corrective or remedial action under, any environmental and safety requirements with respect to the Property, including any liability for property damage, onsite or offsite cleanup costs or damage to natural resources and any obligation to investigate, remediate or otherwise address contamination of land, air, surface water, ground water or otherwise ("Environmental Obligations"), whether arising before or after the Closing, whether relating to the actions or omissions of Heidtman or any predecessor owner, lessee, tenant, occupant or user or any other person or entity and whether related to coal mining or any other activity;

(d) all liabilities and obligations arising out of, relating to or in connection with any transaction, status, event, condition, occurrence or situation which relates to the ownership, operation or use of the Property on or after the Closing;

2886112.1                                              -4-

(e)  all liabilities of the Parties for filing fees, documentary stamps and transfer taxes or public fee assessments arising in connection with the consummation of the transactions contemplated hereby.

7.  **Retention of Liabilities.**   Heidtman shall retain, and PURCHASER shall not assume or be liable for the following liabilities and obligations, which collectively are hereafter referred to as "Retained Liabilities," insofar as the same are incurred prior to Closing:

(a) payments owed to vendors or suppliers for goods delivered to the Mine or services rendered in connection with the Mine (other than goods or services ordered or requested by PURCHASER or its affiliates);

(b) any liabilities and obligations arising out of, relating to or in connection with the employment relationship between Heidtman and any current or former employee of Heidtman (without regard to when incurred);

(c) any liabilities and obligations of the Heidtman for any taxes with respect to its ownership, operation or use of the Property;

(d) any liability for personal injuries relating to the Mine;

(e)  any liability related to completed sales of coal;

(f) any liability for MSHA or SMCRA violations for which notices of violations are issued by the regulatory agency prior to Closing;

(g) any liability arising from Heidtman's obligations under the United States Bankruptcy Code or orders of the Bankruptcy Court.

(h) all liabilities and obligations arising out of, relating to or in connection with any transaction, status, event, condition, occurrence or situation which relates to the ownership, operation or use of the Property by Heidtman that are not Assumed Liabilities and which relate to: (i) work with respect to hazardous substances or materials disposed of prior to the Closing at off-site facilities or at locations not controlled by Heidtman, including without limitation, at third party landfills, recycling or disposal facilities; (ii) any fines, penalties, punitive or multiplied damages, consequential damages, or criminal matters relating to Heidtman's conduct, errors, or omissions; (iii) liabilities for personal or bodily injury (including death and disability) and/or property damage (including loss of use and diminution in value) and (iv) without limiting the foregoing, any and all liens, claims (including but not limited to liens for past response costs, environmental claims, tort claims, product liability claims, workers compensation claims, and contractual claims), encumbrances, taxes, assessments, and any other interests, whether equitable or legal.

8.  **Representations of Heidtman.**  Heidtman represents and warrants to PURCHASER that the statements contained in this Section 8 are correct and complete as of the date of this Agreement.

(a)  ***Organization of the Seller.***  Heidtman is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Ohio and  has all requisite powers and authorities to enter into, execute and deliver this Agreement, to consummate the transactions contemplated by this Agreement and to comply with and fulfill the terms and conditions of this Agreement, subject to Bankruptcy Court approval.

(b)  ***Authorization.***  The execution and delivery by Heidtman of this Agreement and the consummation by Heidtman of the transactions herein contemplated have been duly and validly authorized by the managers of Heidtman.

(c)  ***Broker's Fees.***  Heidtman has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which PURCHASER could become liable or obligated.

(d)  ***Litigation.***  Except as disclosed in this Agreement or by the records provided for PURCHASER's review, there is no claim, action, suit proceeding, arbitration or investigation pending, or to the knowledge of Heidtman, threatened in writing, by or before any governmental authority or private arbitration tribunal to which Heidtman is a party which could materially adversely affect the ability of Heidtman to perform its obligations under this Agreement.

(e)  ***Coal Estate Title.***  Heidtman has not conveyed, created, or suffered any adverse interest in or any lien or encumbrance against the Coal Estate interests covered by the Lease and Sublease except for such adverse interests, liens or encumbrances which appear of record in the county in which the Coal Estate interests are located or which are disclosed herein or in the materials made available to PURCHASER for its review.

(f)  ***Taxpayer Identification Number.***  Heidtman's U.S. Taxpayer Identification number is 20-3063630.

9.  **Representations of PURCHASER.**  PURCHASER represents and warrants to Heidtman and to the Bankruptcy Court that the statements contained in this Section 9 are correct and complete as of the date of this Agreement.

(a)  ***Organization of the Buyer.***  PURCHASER is a duly organized _____, validly existing and in good standing under the laws of _____ _____.  PURCHASER has all requisite powers and authority to enter into, execute and deliver this Agreement, to consummate the

transactions contemplated by this Agreement and to comply with and fulfill the terms and conditions of this Agreement.

(b) *__Authorization.__*   The execution and delivery by PURCHASER of this Agreement and the consummation by PURCHASER of the transactions contemplated herein have been duly and validly authorized by all necessary persons or bodies required under the organizational documents of PURCHASER.

(c) *__Regulatory Approval.__*  Except for the issuance of Replacement Permits no governmental notice, filing, authorization, approval, order, consent or permit is required to be given, filed or obtained by PURCHASER with respect to a governmental authority in connection with the execution, deliver and performance by PURCHASER of this Agreement or the transactions contemplated hereby or thereby.

(d) *__Litigation.__*   There is no claim, action, suit, proceeding, arbitration or investigation pending, or to the knowledge of PURCHASER, threatened in writing, by or before any governmental authority or private arbitration tribunal to which PURCHASER is a party which could materially adversely affect the ability of PURCHASER to perform its obligations under this Agreement.

(e) *__Broker's Fees__*.  PURCHASER has no liability or obligation to pay any fees or commissions to any broker, finder, or agent with respect to the transactions contemplated by this Agreement for which Heidtman could become liable or obligated.

(f) *__Reliance Upon Purchaser's Own Investigations.__*  (i) PURCHASER has (A) been granted the right to enter upon the Mine property for the purposes of inspection, surveying, drilling, soil and grading testing, confirming inventory or other purposes related to this Agreement and to any potential use of the property by PURCHASER; (B) had the opportunity to inspect all litigation files of Heidtman, if any, and all maintenance records mine inspection records and operation records which pertain to the Property; and (C) had the opportunity to inspect all land files maintained by Heidtman, made such title searches of the public records as it deems necessary and accepts title to the Coal Estate in its present state.

(ii) PURCHASER acknowledges that Heidtman has made no representations or warranties prior to execution of this Agreement, express or implied, except those expressed in Section 8 hereof.  **All assets purchased are purchased "AS IS, WHERE IS".**  PURCHASER has not relied upon any estimates by Heidtman concerning the Property or concerning the nature, quantity or quality of the Property; nor has PURCHASER relied upon any estimate or representation of Heidtman concerning the existence, extent or cost to remedy any environmental defect, environmental obligation or reclamation obligation, and with respect to

such matters and all other matters concerning the Property and Assumed Liabilities which are not specifically and expressly addressed by Heidtman's representations and warranties herein.

(iii) Except for express warranties provided for herein, PURCHASER has relied upon, and shall rely upon, its own due diligence investigation of the Property and Assumed Liabilities including the advice of such experts or consultants as PURCHASER has determined to be necessary or desirable in its sole discretion. This Agreement has been entered into after full inspection, investigation, and search or with satisfaction with the opportunity afforded for investigation, inspection and search. PURCHASER acknowledges that Heidtman has requested PURCHASER to fully research and inspect the Coal Estate, other property, other rights, obligations and all other items or matters covered by this Agreement and to rely solely on the results of PURCHASER'S own inspections, investigations and searches rather than upon any information that may have been provided by Heidtman to PURCHASER, including without limitation (A) the coal reserve study pertaining to the Coal Estate prepared by Marshall Miller, (B) an operations study prepared by John T. Boyd and Company and (C) a Capstone Title Opinion dated November 19, 2008, issued by Rhine Ernest, LLP (and the tract opinions upon which that Capstone Title Opinion is based) and any supplements thereto. PURCHASER has agreed to said request and relied solely upon its own inspections, investigations and searches and has not relied information that may have been provided by Heidtman to PURCHASER, including without limitation the items described above in (A) through (C).

(g) ***PURCHASER's Qualifications to Hold Permits.*** As of the date of this Agreement, (a) PURCHASER is eligible to receive the Replacement Permits and (b) neither PURCHASER nor any person which "owns or controls" (as those terms are defined by statute) PURCHASER is prevented by the Applicant Violator System or any laws, rules or regulations of any governmental authority from holding and becoming the sole permittee under the Replacement Permits. No permit block under the Applicant Violator System, Office of Surface Mining Reclamation and Enforcement, United States Department of Interior, is pending or, to PURCHASER's knowledge, threatened against PURCHASER or any person which "owns or controls" PURCHASER.

(h) ***Financial Ability to Perform.*** PURCHASER has the present financial ability to perform this Agreement and pay the Purchase Price at Closing.

(h) ***Taxpayer Identification Number.*** PURCHASER's U.S. Taxpayer Identification number is _____.

10. **Employee Retention Procedures.** PURCHASER shall have access to all employee records and may contact and hire any employee of Heidtman currently working at the Mine upon any

terms that may be agreed upon between them.

11. **Closing Adjustments.** Adjustments to the purchase price shall be made at closing as follows:

    (a)  Real property taxes, if any, shall be prorated between the parties to the date of delivery of the deed using the most recent year's taxes as the basis of proration.

    (b)  Inventory adjustments if inventories have been reduced from the amounts shown in Exhibit B other than in the normal course of business.

12. **PURCHASER's Conditions to Closing.** PURCHASER's obligation to close is conditioned upon all of the following:

    (a)  This Agreement has been approved by the Bankruptcy Court;

    (b)  The representations and warranties set forth in Section 8  above shall be true and correct in all material respects at and as of the closing  as if made by Heidtman on and as of such date;

    (c) Heidtman shall have performed and complied with all of its covenants hereunder in all material respects;

    (d)  There shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

    (e)  Except for the Assumed Liabilities, the Bankruptcy Court order approving the sale of assets herein provides that the conveyances are made free and clear of all liens, claims and encumbrances as allowed by the Bankruptcy Code, 11 USC section 363.

    (f)  Heidtman shall have delivered to PURCHASER a certificate signed by an officer of Heidtman to the effect that each of the conditions specified herein in subparagraphs (b) through (e) is satisfied in all respects;

    (g) All actions to be taken by Heidtman in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby are in form and substance reasonably satisfactory to PURCHASER or the Bankruptcy Court.

PURCHASER may waive any condition specified in this Section 12 if it executes a writing so stating at or prior to the Closing.

13. **Heidtman's Conditions to Closing.**  Heidtman's obligation to close is conditioned upon all of the following:

    (a)  This Agreement, any necessary approvals of other transaction documents, shall  have

been approved by the Bankruptcy Court;

(b)   The representations and warranties set forth in Section 9 above are true and correct in all material respects at and as of closing as if made by PURCHASER on and as of such date;

(c)   PURCHASER shall have performed and complied with all of its covenants hereunder in all material respects;

(d)   There shall not be any injunction, judgment, order, decree, ruling, or charge in effect preventing consummation of any of the transactions contemplated by this Agreement;

(e)   PURCHASER shall have delivered to Heidtman a certificate to the effect that each of the conditions specified above in clauses (b) through (d) is satisfied in all respects;

(f)   All actions taken by PURCHASER in connection with consummation of the transactions contemplated hereby and all certificates, opinions, instruments, and other documents required to effect the transactions contemplated hereby will be in form and substance reasonably satisfactory to Heidtman.

Heidtman may waive any condition specified in this Section 13 if it executes a writing so stating at or prior to the Closing.

14. **Closing.**   Unless otherwise agreed by the parties, Closing shall take place at 9:00 a.m. Central Time, on the first business day that is fifteen (15) calendar days after entry of a Bankruptcy Court order approving this Agreement. Closing shall occur at a mutually acceptable location in Ft. Smith, Arkansas.

(a) At Closing, PURCHASER shall deliver to Heidtman:

(i)   the purchase price provided for in Section 3, as adjusted under Section 11, in immediately available funds wired according to the instructions provided by Heidtman or the Bankruptcy Court;

(ii)   Any transfer documents requiring execution by PURCHASER, including without limitation an assumption of assigned leases;

(iii)   an executed closing statement; and

(iv)   such other documents as may reasonably be required to consummate the transaction contemplated by this Agreement.

(b)  At Closing, Heidtman shall deliver to PURCHASER:

(i) evidence of all necessary approvals from the Bankruptcy Court;

(ii) executed originals of a Deed and an Assignment, in substantially the forms attached hereto, and a bill of sale for all of the Property which is personal property (other than vehicles with certificates of title);

(iii) certificates of title for any licensed vehicle which is part of the Property;

(iv) an executed closing statement;

(v) such other documents as may reasonably be required to consummate the transaction contemplated by this Agreement; and

Each party to this Agreement shall bear its respective costs and expenses in connection with the preparation, execution and performance of this Agreement, including all fees and expenses of agents, representatives, counsel, accountants and consultants. PURCHASER shall pay the costs of recording fees, documentary stamps, intangible taxes, transfer taxes related to this Agreement or any transaction hereunder.

15.    **Replacement Mining Permits.**   (a) Within sixty (60) days after the Effective Date, PURCHASER shall submit to the appropriate agencies all documents and applications required by such agencies to (i) obtain permits (the "Replacement Permits") in PURCHASER's name as sole permittee as replacement of all Existing Permits and (ii) obtain bonds (the "Replacement Bonds") required by such Replacement Permits. Heidtman shall provide to Buyer and to appropriate agencies such information as is readily available to Heidtman in order to assist Buyer in its application for Replacement Permits. The Replacement Permits and Replacement Bonds shall be sufficient to cause regulatory agencies to recognize them as full replacements for the Existing Permits and to release Heidtman from the Existing Permits and Existing Reclamation Bonds. PURCHASER shall use its best efforts to ensure that Replacement Permits are obtained on the earliest practicable date. PURCHASER shall not withdraw any application for a Replacement Permit without the prior written consent of Heidtman. PURCHASER shall use its best efforts to cause the Replacement Permits which are Mining Permits to be issued simultaneously with the release of Heidtman's Permits and Reclamation Bonds.

(b) PURCHASER shall provide to Heidtman copies of all permit filings, permit applications and correspondence and other written communications with governmental authorities in connection therewith and shall otherwise keep Heidtman apprised of the status of the Replacement Permit application. PURCHASER shall also maintain records documenting its reclamation and other activities with regard to the Property.

(c) Heidtman shall retain such control over the Property and mining operations as may be

- 11 -

required by law for mining to commence or continue, after Closing, under permits held by Heidtman but under the direction of PURCHASER.  Such control shall terminate upon issuance of Replacement Permits or at any earlier time PURCHASER designates but in no event shall such control continue more than one hundred twenty (120) days after Closing without Heidtman's written consent.  PURCHASER shall conduct such operations as required by law and regulation and shall promptly pay, upon demand from  Heidtman, any cost, including without limitation, all civil liabilities and fines, defense costs and attorneys' fees, which Heidtman may incur because of its status as permittee during this period.

16.  **Removal of Heidtman's Identifiers.**   As soon as practicable after closing, PURCHASER shall remove the names, marks and identifications heretofore used by Heidtman, and all variations and derivatives thereof and logos relating thereto, from the Property to the extent they include the names associated with Heidtman.

17.   **Records.**   For a period of seven years after closing, Heidtman shall retain all records pertaining the Mine and allow PURCHASER full access to the same, or, alternatively, deliver said records to PURCHASER.  PURCHASER shall keep and maintain all books and records at the Property or pertaining to the Mine for a period of not less than seven years after Closing. Each party shall give the other access to such books and records at such times as may be reasonably requested following the Closing and shall allow the other to make copies thereof at its own expense.

18.  **Risk of Loss.**  If this Agreement is approved by the Bankruptcy Court and closes, Risk of Loss occurring after Closing shall be upon Purchaser.  If there is a material  loss to any of the Property prior to Closing, Purchaser shall  have the right to terminate this Agreement upon giving written notice to Heidtman prior to Closing.   In the event that Purchaser elects to terminate this Agreement pursuant to this paragraph 18, this Agreement shall be void.   If terminated, all insurance proceeds attributable to such loss shall be paid to (or insurance claim shall be retained by) Heidtman. If this Agreement is not terminated, then upon Closing, all insurance proceeds shall be paid (or insurance claim shall be assigned) to Purchaser.  Heidtman shall not be otherwise required to compensate Purchaser for any loss occurring prior to Closing.

19.   **Binding effect.**  Following approval by the Bankruptcy Court, this Agreement shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, successors or assigns, subject to the terms and conditions hereof.

20.  **Counterparts.**  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which constitute but one and the same instrument.

21.  **Recording Memorandum.**  At the request of PURCHASER, Heidtman shall execute a recording memorandum for the purpose of placing of record in Sebastian County, Arkansas, the rights of PURCHASER under this Agreement.

22. **Notices.** All notices and other deliveries provided for in this Agreement shall be addressed to the parties at their addresses set forth above or to the following:

- 12 -

2886112.1

If to Heidtman:

    405 Madison Ave., Suite 1900
    Toledo, OH 43604

with copies to:

| | |
|---|---|
| Mark Ridenour | George H. Tarpley |
| 405 Madison Ave., Suite 1900 | Cox Smith Matthews, Incorporated |
| Toledo, OH 43604 | 1201 Elm Street, Suite 3300 |
| Mark.Ridenour@Heidtman.com | Dallas, Texas 75270 |
| | gtarpley@coxsmith.com |

and

    John E. Rhine
    Rhine Ernest LLP
    One Main Street, Suite 600
    Evansville, IN  47708-1464
    jrhine@rhine-ernest.com

    If to PURCHASER:

    [            ]

All notices provided for herein may be delivered by the following means:  (1) United States mail which provides proof of delivery; (2) commercial express service providing proof of date and time of delivery; (3) personal delivery; or (4) facsimile.  However, service by electronic mail shall not be effective notice.

23.  **Entire Agreement.**   This Agreement supersedes all prior agreements between the parties with respect to its subject matter and constitutes a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.

24.  **Time of Essence.**  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

25.  **Governing Law.**  This Agreement shall be governed by the laws of Ohio, except for matters directly pertaining to real estate title or the Arkansas Surface Coal Mining and Reclamation Act of 1979, as amended, which shall be governed by the laws of Arkansas.  As to any dispute over which the Bankruptcy Court has or accepts jurisdiction, such dispute shall be submitted to the Bankruptcy Court for disposition.

- 13 -

**SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT**

EXECUTED on this _____ day of _____, 2010.

**HEIDTMAN MINING, L.L.C.**

By: _____
    Mark Ridenour
    Its:  Co-Manager

**[                            ]**

By: _____
   [                            ]
   Its:  [                            ]

- 14 -

2886112.1

**EXHIBIT A**
to
**ASSET PURCHASE AGREEMENT**
**by and between**
**Heidtman Mining, LLC and** _____

| Counterparty | Cure Amount | Contract/Lease Description |
|---|---|---|
| ASARCO | $   470,677.42 | Royalty Agreement dated October 31, 2005; First Amendment to Royalty Agreement dated January 30, 2006. |
| Albert Shankle and Susan Shankle | $          - | Temporary Right of Way and Easement from Albert Shankle and Susan Shankle, to Mid-America Mining and Development, Inc., dated February 14, 2003. |
| DeWayne Edwards, Rose Edwards, Albert Shankle and Susan Shankle | $          - | Shale Use Agreement by and between DeWayne Edwards, Rose Edwards, Albert Shankle and Susan Shankle, and Mid-America Mining & Development, Inc., dated February 14, 2003. |
| DeWayne Edwards and Rose Edwards | $          - | Coal Mine Land Lease Agreement by and between DeWayne Edwards and Rose Edwards, as lessors, and Mid-America Mining and Development, Inc., as lessee dated August 20, 2000. |
| DeWayne Edwards, Rose Edwards and Albert Shankle | $          - | Agreement to Grant and Convey Right of Way and Easement by and between DeWayne Edwards, Rose Edwards and Albert Shankle and Mid-America Mining & Development, Inc., dated November 15, 1996. |
| DeWayne Edwards | $          - | Coal Mining Lease by and between DeWayne Edwards, as lessor, and H.H.H. Mining, Inc., as lessee dated August 20, 1990, as modified by (a) Asssignment and Assumption of Coal Mining Lease dated December 21, 1992; and (b) Coal Mining Lease by and between DeWayne Edwards, as lessor, and Mid-America Mining & Development, Inc., as lessee, dated November 15, 1996. |
| Glenda K. Hill and Bobby R. Hill | $          - | Easement from Glenda K. Hill and Bobby R. Hill to Mid-America Mining and Development, Inc., dated November 3, 2000. |
| Kenneth M. Couch and Nola Imogene Couch | $          - | Easement from Kenneth M. Couch and Nola Imogene Couch to Mid-America Mining and Development, Inc., dated November 15, 2000. |

- 15 -

| Counterparty | Cure Amount | Contract/Lease Description |
|---|---|---|
| Hudson Mining Company, Inc., Blake Mining Company, Inc., and H.H.H. Mining Company, Inc. | $ - | Coal Mining Lease from Hudson Mining Company, Inc., Blake Mining Company, Inc., and H.H.H. Mining Company, Inc., to Mid-America Mining and Development, Inc, an Arkansas corporation dated December 21, 1992. |
| Hudson Mining Company, Inc. and Blake Mining Company, Inc. | $ - | Temporary Easement from Hudson Mining Company, Inc., and Blake Mining Company, Inc., to Mid-America Mining and Development, Inc., dated November 15, 2000. |
| John Chambers | $ 750.00 | Letter Agreement between John Chambers and Heidtman Mining, LLC for Road Lease dated July 3, 2007. |
| Ohio Holdings, Inc. | $ 83,500.92 | Royalty Agreement between Hartshorne Carbon Company, an Arkansas corporation, and Ohio Holdings, Inc., a Delaware corporation, dated March 16, 2006, as amended by First Amendment to Royalty Agreement dated January 30, 2006, and a Coal Security Agreement dated October 31, 2005. |
| The Roy Reed Partnership | $ 18,853.42 | Mining Agreement from the Roy Reed Partnership and Mid-America Mining and Development, Inc., an Arkansas corporation dated March 9, 1992. |
| Terry Roberts | $ 500.00 | Letter Agreement between Terry Roberts and Heidtman Mining, LLC for Road Lease dated June 26, 2007. |
| Wilkem, Inc. | $ 244,030.57 (plus monthly minimum royalties accrued between February 1, 2010 and closing) | Coal Lease [Wilkem Sublease] dated April ____, 1991, from Wilkem, Inc., a Tennessee corporation, to Mid-America Mining and Development, Inc. an Arkansas corporation, a memorandum of which dated April 15, 1992; Waiver and Amendment to Coal Lease dated March 26, 1992; Aggregate Coal Lease Agreement dated December 22, 2000; Second Amendment to Coal Lease dated December 22, 2000. |
| Wilkem, Inc. | $ - | Development Agreement dated December 22, 2000 between Wilkem, Inc. and CDX Gas, LLC and Gas Development Agreement dated December 22, 2000 between Mid-America Mining and Development, Inc. and Wilkem, Inc. |

- 16 -

**EXHIBIT B**
to
**ASSET PURCHASE AGREEMENT**
**by and between**
**Heidtman Mining, LLC and** _____

**1.      Titled Vehicles**

| Year, Make, Model | VIN |
|---|---|
| | |
| 1995 Chevrolet K1500 Tahoe | 1GNEK13K5SJ380783 |
| 2002 Chevrolet K2500hd Silverado | 1GCHK24U02E232562 |
| 2002 Chevrolet Avalanche K1500 | 3GNEK13T12G220345 |
| 1996 Ford E Super Duty RV | 1FDLE40G3THB41147 |
| 1997 Ford E Super Duty RV | 1FLDE40S6VHB42039 |
| 1997 Ford E Super Duty RV | 1FDLE40S1VHA84616 |
| 2003 Chevrolet K2500hd Silverado | 1GCHK24U23Z148673 |
| 1983 Ford 8000 Service Truck | 1FDNR8OU6DVA46515 |
| 1982 GMC TopKick 7000 Water Truck | 1GDM7D1Y7DV508382 |
| | |

**2.      Equipment**

| Manufacturer | (Qty.) Description | Serial No./VIN No. |
|---|---|---|
| Joy Mining | (2) Continuous Miner ("CM") -1998 CM Wet Head Drum Set CM Wet Head Cutter Gear Case | JM5174 & JM4927 |
| Engart | Dust Scrubber for Miner | |
| Coal Age | (5) Shuttle Car ("SC") | 2006-03-10042006 2006-08-10012006 2006-03-10022006 2006-04-10012006 2006-08-10022006 |
| Jeffery | (3) Ram Car #1, 2, & 3 Model 4110 | 38269 38273 38378 |

2886112.1

| | | |
|---|---|---|
| Cogar | Feeder Breaker, Model CF56-A3-G-DH 2005 | 2005-075 |
| | Roof Bolter, Model DDR-15-BCW 2005 | ET13468 |
| Fletcher | (2) Roof Bolter: Model CRRII-17 2005 | 2005090<br>2005091 |
| Lo Trac | Mantrip: Model F3L1011F | 40608 |
| Hydra Power | (2) Mantrip Model 10236402 | 61039<br>61040 |
| | (3) Personnel Carrier | 60860<br>60861<br>60862 |
| Intermountain Electronics | (3) Power Center | 51791<br>54112<br>1-Unknown |
| | Vacuum Circuit Breaker Switch House | |
| | 2000KVA Slope Belt Conveyor | |
| | Power Center | 851-5/06 |
| | 15 KVA Mine Power-Feed Cable; 4200 Ft, 550 ft joints with PLM couplers; all 2/0, 3C, GGC | |
| | New Sub Station @ Plant | |
| | Old Substation 12470 Volt | |
| GE | 2.5 MW Generator | 69-E1-1075 |
| Caterpillar | Caterpillar Generator, Engine<br>    CAT 3406 Model EER20 | |
| | Caterpillar Generator, Engine<br>    CAT 3406 Model EER22 | IL200745 |
| | 1995 - D6H-LGP Dozer Series 11 | 3YG06165 |
| | 2005 - 277B Skid Steer Loader | CN02373 |
| Jeffery | 8 Ft. Main Mine Ventilation Fan<br>    Model 8BHU-96 | 36849 |
| | Ventilation Fan 400 HP Model 8HU-97 | 36849 |
| Continental Conveyor | (2) Conveyor Slope Belt 54 inch- #1<br>                54 inch-West Belt #2<br>Section Conveyor Belt 42 inch-#3 | |
| Komatsu | WA450-#MC Articulated Loader | A31265 |

|  | WA250-3MC Articulated Loader | A71595 |
|  | (2) Loader | A92127<br>A92201 |
| Daewoo | 2006 Fork Lift G25E |  |
| Eriez | PP Raw Coal Handling System: Belt Magnet |  |
|  | PP Clean Coal Conveyor, 180 TPH Capacity,<br>300 FPM, 36'W x 102'L x 9' lift |  |
|  | PP Magnetic Separator, Model 36" x 117" Self-Leveling |  |
| Ramsey | PP Clean Coal Belt Scale |  |
| James A. Radding | PP Clean Coal Swing Arm-9 Iron Swing Sampler |  |
| Peters Equip. | Prep Plant ("PP"): |  |
|  | PP Raw Coal Handling System: Raw Coal Bunker<br>12'H x 8'Wx16'L (inside dimensions) |  |
|  | PP Raw Coal Handling System: Vibratory Feeder<br>42"Wx84"L Model FMC XP MF-200-C |  |
|  | PP Raw Coal Handling System: Tunnel |  |
|  | PP Raw Coal Handling System:<br>Plant Feed Conveyor 452'L x 121' Lift |  |
|  | PP Raw Coal Handling System: Loading Hopper |  |
|  | PP Raw Coal Handling System: Raw Coal Belt Scale |  |
| Superior<br>Conveyor | PP Clean Coal Stacking, 180 TPH (250 TPH Design)<br>Speed: 300 FPM 36" W x 100'L |  |
|  | PP Refuse Conveyor Belt, 66 TPH, 300 FPM, 3' W<br>x 72' L |  |
|  | PP Refuse System Transfer Point, Supports<br>Chute to stacker conveyor |  |
|  | PP Refuse Stacker Conveyor, 85 TPH, 300 FPM,<br>36" W x 100'L x 30'lift |  |
|  | PP Raw Coal Deslime Screen – Banana Screen,<br>300 TPH, 10' W x 20' L |  |
|  | PP Oversized Material Bunker, 20'W x 12'D x 8'H<br>with 8" thick floor, back wall w/ 4 Embedded<br>rails to prevent damage from loader bucket |  |
|  | PP Heavy Media Pulping Column,<br>203 TPH, 24" (inside diameter) |  |

- 19 -

| | | |
|---|---|---|
| | PP Heavy Media Cyclone Sump & Pump, 2564 GPM Capacity,<br>   1.8 Slurry S.G., 875 RPM, Hinged full face guard,<br>   166.5 brake HP; Model 8x6 FXU | |
| | PP Magnetite Bin and Feeder:  Bin-8" diameter<br>   x 18' vertical x 60° cone; Feeder –<br>   6 TPH (min) capacity, 9" diameter | |
| Ludowici | PP Coarse Clean Coal Centrifuge, 125 TPH model VM1400 2KB | |
| Krebs | PP Heavy Media Cyclone Model D33-T214x73 x16 | |
| | PP Heavy Media Cyclone Clean Coal Curved Sieves, 5' W x 80" Radius x 45 degree arc | |
| | PP Heavy Media Cyclone Clean Coal Curved Sieves, 5' W x 80" Radius x 45 degree arc | |
| | PP Coarse Clean Coal Drain & Rinse Screen,<br>feed rate 152 TPH, 900 RPM, 6'W x 16'L - horizontal model | |
| | (5) PP Raw Coal Classifying Cyclones;<br>   Model D15LB-t123 x 14 x 5.25 | |
| Texas Nuclear | PP Heavy Media Cyclone Nuclear Density | |
| | PP Thickener Underflow Nuclear Density | |
| Conn-Weld | PP Cyclone Refuse Flat Sieve, 5'W x 4'L | |
| | PP Refuse Drain & Rinse Screen 6'Wx16'L | |
| | PP Refuse Dewatering High Freq. Screen; 6'Wx12'L | |
| Warman | PP Classifying Cyclone Pump, 3315 GPM, slurry S.G. 105, RPM 610, 86.7 brake HP, Model 10/8 FXU | |
| | PP Classifying Cyclone Sump, 12' diameter<br>w/60° cone bottom and 6' straight sides,<br>8" dia. pipe drain, with bolted blind flange | |
| | PP Dilute Pump Model 6/5 DXU | |
| | PP Dilute Sump<br>8' dia. w/60° cone bottom & 6' straight sides | |
| | PP Clarified Water Pump, Model 10/8 FXU | |
| | PP Thickener Underflow Pump, Model 4/4 CXU | |
| Roche | PP Clean Coal Spirals Model Triple Start LD7RC | |
| | PP 2 Stage Fine Coal Sieves 8' x 80' radius x 45° | |
| | PP Effluent/Middling's Sump; 6' dia.<br>   w/ 60° cone bottom & 4'straight sides | |

- 20 -

| | | |
|---|---|---|
| Decanter Machine | PP Screen Bowl Centrifuge 36 x 72 | |
| Eimco | PP Thickener 70' diameter | |
| Toyo | PP Basement Clean-Up Sump & Pump, Model DL-15 Submersible | |
| Atlas Copco | PP Compressed Air System, 100 cfm @ 125 psi ASME | |
| | PP Plant Wash-down System | |
| | PP Oxygen & Acetylene And Welding System | |
| | PP Operator's Room/MCC room 8'x 9'x 40'ConEx | |
| Acco | PP Machinery Hoist & Lift Beams   Mode 5 ton Wire Rope Hoist | |
| Hankinson | PP HBP-600 Blower Purge Desiccant Air Dryer | |
| Morgantown | PP SD 2-HD Slinger Duster Hydraulic-Driven,   2900 lb. Cap. 29" overall height max | |
| | PP Product Belt Scale | |
| | PP Product Radial Stacker | |
| | PP ConEx 8'x9'x 40' trailer (tool & parts room) | |
| | PP Fine Coal Circuit-MCC room; ConEx 8'x9'x20' | |
| | PP Fine Coal Circuit - Jameson Flotation Cell Sys. | |
| Godwin | 8" Dri-Prime Diesel Trash Pump, Mod.CD225M | 64557417 |
| Sunflo | High Pressure Booster Pump X-Cut 15 | |
| Decanter Machine | (2) PP Fine Coal Circuit –   Decanter Screen Bowl Centrifuge System | |
| | PP Fine Coal Circuit-Pump & 200 Hp motor   (for Jameson floatation cell)-5200 gal/min | |
| | PP Fine Coal Circuit - 30' product belt for float cell | |
| | PP Fine Coal Circuit –   (2) 2,000 gal plastic storage tanks | |
| | PP Fine Coal Circuit –   (2) metering pumps 0-6 gals/min | |
| | PP fine Coal Circuit - (3) knife gate valves | |
| | PP Fine Coal Circuit - Sump   (for Jameson Floatation Cell) | |

- 21 -

| | | |
|---|---|---|
| | PP Fine Coal Circuit - Soft start (for Decanter drive motor) | |
| | PP Fine Coal Circuit - Electrical slide in box (for motor control panel) for water only cyclone pump (starter & breaker) | |
| | PP Fine Coal Circuitry - Electrical slide in box (for Motor control panel for Decanter) | |
| Stancor | Mine Dewatering Pumps, (17 total, descriptions follow): 10 HP Pump XC-18 E-2 West Mains 5 HP Pump X-Cut 19 5 HP Pump #2-X-Cut 19 5 HP Pump X-Cut 32 E-8 28 HP Pump 42x-Cut E-2 10 HP Pump 42 X-Cut E-2 18 HP Pump X-Cut 3 5 HP Pump XC-12 E-6 West Mains X 30' lifts (2) 28 HP Pumps #1 X-Cut 20 5 HP Pump XC-2 E-3 South Mains 18 HP Pump X-Cut 3 (3) 28 HP Pumps X-Cut 9 28 HP Pump E-7 X-Cut 10 13 HP Pump E-6 X-Cut 19 | |
| | (2) SAT Pumps | |
| Conspec | Mine Monitoring System: Surface alarm, blue inputs, red output stations, alarm & strobe, fiber-optic cable | |
| | (225) Drager Oxy K Plus SCSRs in service | |
| | (134) Self Rescuer SR-100s in service | |
| | FEMCO Mine Communication System | |
| | (2) Battery for Scoop Type E-155-21 | |
| A.L. Lee | Rock Dust Tanker-50 Ton | 06-E8762 |
| | Gardner-Denver 150 Air Compressor | 06-E8871 |
| | Rock Dust Pressure Tank | 06-E8849 |
| | Mini-Trickle Duster | 06-E8890 |
| | Mini-Trickle Duster | 06-E8848 |
| | Diesel Mini-Trac Non-Permissible | 06-E8847 |
| | Spot Drill Attachment for Mini-Trac Model 360 Spot Drill | 07-E8952 |
| | Belt Master II Rock Duster | 06-E8750 |
| | Bantam Duster | 06-E8891 |
| | Bantam Duster | 06-E8809 |

- 22 -

| | Bantam Duster | 06-E8808 |
| | Bantam Duster | 33URAI |
| | Mini Master Hydraulic Rock Duster | 05-E8378 |
| | Pressure Tank | 07-E9540 |
| | Pressure Tank | 07-E9541 |
| | Life Shelter | 08-LS9158 |
| | Mini-Trick Permissible Rock Duster | 06-E8749 |
| Femco | PP Communication System | |
| Fairchild International | Fairchild Scoop Model 35C-WH2-25 | T400-103 |
| Pewag | Hexa Spike 12 MM Tire Chain | |
| | Raw Coal Hopper | |
| | High Voltage Switch in Pit | |
| | High Voltage at 32 X-Cut 3 Entry | |
| | Hopper for Raw Coal Belt | |
| | Stacker Belt | |
| | Conveyor Tail Piece | |
| | ConEx 8'x 9'x 40' trailer by Mine Timber Yd | |
| | ConEx 8'x 9'x 40' trailer (empty) | |
| | ConEx 8'x9'x 40' trailer (Rock Core Storage) | |
| | Phone System & Wireless Network:  AT&T Matrix, (11) multiple line, Pager, Handsets | |
| Hall Tank | 10,000 gal Double Wall Diesel Above Ground Diesel Storage tank | 386809 |
| DXP | BG-4 Mine Rescue Unit #1 | ARZE-0396 |
| | BG-4 Mine Rescue Unit #2 | ARWL-0229 |
| | BG-4 Mine Rescue Unit #3 | ARWL-0004 |
| | BG-4 Mine Rescue Unit #4 | ARWL-0107 |
| | BG-4 Mine Rescue Unit #5 | ARWL-0005 |
| | BG-4 Mine Rescue Unit #6 | ARWL-0116 |
| | BG-4 Mine Rescue Unit #7 | ARKJ -0185 |
| | BG-4 Mine Rescue Unit #8 | ARWL-0177 |
| | BG-4 Mine Rescue Unit #9 | ARWL-0108 |
| | BG-4 Mine Rescue Unit #10 | ARXJ- 0171 |
| | BG-4 Mine Rescue Unit #11 | ARWL-0011 |
| | BG-4 Mine Rescue Unit #12 | ARWL-0232 |
| | Mine Rescue Trailer | 49TCB101231061147 |
| | Mine Rescue Communication Line | |

- 23 -

|  | Mine Rescue Oxygen Booster pump Model ML7000AZ | PO8144 |
|---|---|---|
|  | (2) RZ50E Test Kits |  |
|  | Industrial Scientific 3 Gas Meters | 0811187-003 |
|  | Industrial Scientific 3 Gas Meters | 0811187-002 |
|  | Industrial Scientific 3 Gas Meters | 0811187-001 |
|  | Industrial Scientific 3 Gas Meters | 0811187-004 |
|  | Multi Charger for Industrial Scientific 3 Gas Meters |  |
| Powell | Powell Scoop Model PE-300 | PE3025 |
| Wagner | Wagner Diesel Scoop |  |
| Various | Computers & Network Hardware: Laptops, Server, satellite dish, printers |  |
| MCI | Distribution Box Distribution Box Model 33914-58915-1201 |  |

**3.      Fixtures and Improvements to Real Estate not described in ¶ 2 above; Equipment**

a.   [Description of  Coal PP] Modular Processing Preparation Plant, 300 TPH constructed by Peters Equipment Co. in 2006-Concrete pad, steel structure, metal exterior walls. Jameson Cell fine coal circuit addition 2008.

b.   [Description of  Office/Bathhouse Facilities] Constructed in 2006: Concrete slabs, metal & masonry exterior wall, masonry and sheet rock interior walls. Restrooms and bathhouse facilities. Approx dimensions: 100 ft x 40 ft.

Warehouse:  Constructed in 2006: Concrete slabs, metal & masonry exterior walls, masonry and sheet rock interior walls.
Approx dimensions: 35 ft x 65 with 3 offices and "tool" room upper, 1 restroom lower.

c.   [Description of  Loading Facilities]
Truck Scale System-is installed except for electronics.
(Once electricity is on, electronics will be installed and the system calibrated.  Once calibrated, Memphis Scale will certify scale system for use.)

d.   [Description of  Other Facilities, e.g.,  machine shop, coal storage]

Mine Pit Office/Repair Shop: Concrete slab, metal exterior walls.
Approx 20 ft x 40 ft; one office, lamp room & shop stall-no restroom

- 24 -

Guard Shack: Constructed in 2008: wood exterior walls.

Diesel Shop, Steel Storage Building, Air Compressor Building, Oil Shed

Slope Belt Starter Control Building:  Constructed in 2006: Separate metal exterior motor control building for starting 4 x 400 hp 480 volt slope belt conveyor drive motors; in weather proof enclosures.

PP Trailer: Contains PP Manager's Offices and Records
Land Improvements:
>            Refuse Area
>            Ponds
>            New Roadway and Improvements
>            Barrier Wall
>            Fence
>            Spoil Pullback
>            Water Supply & Distribution System

## 4.    Insurance Policies

| Issuer | Type-Current Effective Dates | Policy Number |
|---|---|---|
| **Arch Specialty** | **Commercial GL-07/02/09-07/02/10** | **CSPKG0053500** |
| | General Aggregate Limit: $2 million | |
| | Each Occurrence: $1million | |
| **Travelers Indemnity** | **AR Workers Comp-09/24/09-09/24/10** | **9948L166 UB** |
| | Bodily Injury by Accident: $100,000 | |
| | Bodily Injury by Disease:   $500,000 policy limit | |
| | Bodily Injury by Disease:   $100,000 ea. Employee | |
| **Lockton – Lloyd of London** | **Equipment Insurance – 09/01/09-09/01/10** | **PRPNA0900618** |
| | Above & Underground Ground Equipment: $3 million | |

## 5.    Coal Inventory

a. As of 11/02/09 no coal on surface

6. **Supplies and Part Inventories**

See Detailed Inventory Valuation by Part @ 02/06/09

7. **Other**

a.      Prepaid Wilkem Royalty @ 2/06/09:          $2,146,029.31
($2,262,697.31-$116,668.00 Oct '08-Jan '09 obligation in A/P)

b.      Contributions in Aid of Construction - Permanent Power
Electric Distribution Line:  $900,000 to Arkansas Valley Electric

- 26 -

**EXHIBIT C**
**to**
**ASSET PURCHASE AGREEMENT**
**by and between**
**Heidtman Mining, LLC and _____**

**Excluded Assets:**

1. **Parts and Supplies Inventory @ 2/6/09:**
   a. **54" 1000 PIW 4 Ply Belt MSHA: 7884 ft. valued at $647,039.88**
      **returned to vendor and consigned resale on 2/2/09.**

2. **Bank Accounts owned by Debtor, including:**
   a. **Heidtman Mining LLC – Debtor in Possession – Regions Bank**
      i. **Operating Account # 0087653060**
      ii. **Payroll Account # 0087653133**
      iii. **Tax Account # 0087652773**

3. **Letter of Credit: Fifth Third Bank – MaxSaver Account # 7341313240 pledged to ADEQ - $ 471,067.82**

4. **Certificate of Deposit – Regions Bank – pledged to ADEQ - $95,000**

5. **Any claims or causes of action incurred by Heidtman Mining, LLC prior to closing.**

2886112.1